LEV L. DASSIN
Acting United States Attorney for the
Southern District of New York
By: BARBARA A. WARD
      SHARON E. FRASE
Assistant United States Attorneys
One St. Andrew's Plaza
New York, New York 10007
Telephone: (212) 637-1048/2329

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | GOVERNMENT'S EX PARTE APPLICATION FOR POST-INDICTMENT WARRANT OF SEIZURE PURSUANT TO 21 U.S.C. § 853(f) (410 NORTH LAKE WAY, PALM BEACH, FL) |
| - v. - | |
| BERNARD L. MADOFF, | |
| Defendant. | 09 Cr. 213 (DC) |

The United States of America respectfully moves the Court pursuant to Title 21, United

States Code, Section 853(f), for a Post-Indictment Warrant of Seizure authorizing the United

States Marshals Service, its agent or designee to seize the following asset of BERNARD L.

MADOFF, the defendant (the "defendant"):

> All that lot or parcel of land, together with its buildings,
> appurtenances, improvements, fixtures, attachments and easements
> known as 410 North Lake Way, Palm Beach, Florida, 33480, and
> all insured and readily salable personal property contained therein,

(hereinafter referred to as the "Subject Property") as more fully described in Schedule A of

Exhibit A hereto.

1.      The Subject Property is subject to forfeiture upon conviction of the defendant for

violation of federal law, as set forth more fully herein.

2.      Pursuant to 21 U.S.C. § 853(f), where there is probable cause to believe that the property to be seized would, in the event of conviction, be subject to forfeiture, and a restraining order under 21 U.S.C. § 853(e) may not be sufficient to assure the availability of the property for forfeiture, the Court "shall issue a warrant authorizing the seizure of such property."

BACKGROUND

3.      On December 11, 2008, United States Magistrate Judge Douglas F. Eaton issued a warrant for the defendant's arrest based on a Criminal Complaint charging the defendant with securities fraud. (*See* Affidavit of Special Agent Steven N. Garfinkel ("Garfinkel Aff."), which is submitted herewith in support of the Government's Application.

4.      On March 10, 2009, the United States Attorney for the Southern District of New York filed Information 09 Cr. 213 (DC) (the "Information") (attached hereto as Exhibit B) charging BERNARD L. MADOFF, the defendant, eleven felony charges, including securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, and 17 C.F.R. § 240.10b-5 (Count One); investment adviser fraud, in violation of 15 U.S.C. §§ 80b-6 and 80b-17 (Count Two); mail fraud, in violation of 18 U.S.C. § 1341 (Count Three); wire fraud, in violation of 18 U.S.C. § 1343 (Count Four); money laundering in violation of 18 U.S.C. § 1956(a)(2)(A) (Count Five); money laundering, in violation of 18 U.S.C. § 1956 (a)(1)(B)(i) and (f) (Count Six); money laundering, in violation of 18 U.S.C. § 1957 (Count Seven); false statements, in violation of 18 U.S.C. § 1001(a) (Count Eight); perjury, in violation of 18 U.S.C. § 1621 (Count Nine); false filings with the SEC, in violation of 15 U.S.C. §§ 78q(e) and 78ff, and 17 C.F.R. §§ 17a-5, 240.17a-13 and 210.2-01 (Count Ten), and theft from an employee benefit plan, in violation of 18 U.S.C. § 664).

2

5.     The Information also contains two criminal forfeiture allegations. The first Forfeiture Allegation charges forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) seeking forfeiture of all property, real and personal, that constitutes or is derived from proceeds traceable to the offenses constituting "specified unlawful activity" as defined in 18 U.S.C. § 1956(c)(7), as alleged in Counts One, Three, Four, and Eleven of the Information, and substitute assets. The second Forfeiture Allegation in the Information seeks forfeiture pursuant to 18 U.S.C. § 982 of all property, real and personal, involved in the money laundering offenses in violation of 18 U.S.C. §§ 1956 and 1957 charged in Counts Five through Seven of the Information, and substitute assets.

6.     On March 12, 2009, the defendant pleaded guilty to the eleven-count Information without a plea agreement.

7.     On or about March 16, 2009, the Government filed notice that the property which the United States alleges is subject to forfeiture includes the Subject Property.

8.     On or about March 16, 2009, the Government filed a Notice of Lis Pendens with respect to the Subject Property with the Clerk of Palm Beach County, Florida.

Statutory Bases for Criminal Forfeiture

9.     Pursuant to 18 U.S.C. § 981(a)(1)(C), "[any property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity' (as defined in [18 U.S.C. § 1956(c)(7)]), or a conspiracy to commit such offense," is subject to forfeiture to the United States. This provision, standing alone, is a civil forfeiture provision. However, where federal law provides for civil forfeiture but there is no

parallel criminal forfeiture provision, criminal forfeiture is mandated nonetheless, pursuant to 28

U.S.C. § 2461.[1]

10.     "Specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7), and the term

includes any offense listed under 18 U.S.C. § 1961(1). Section 1961(1) lists, among other

offenses, violation of 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C.

§ 664 (theft from an employee benefit plan), and "fraud in the sale of securities."

11.     Title 18, United States Code, Section 982(a)(1) provides, in pertinent part, that:

> [t]he court, in imposing sentence on a person convicted of an
> offense in violation of section 5313(a), 5316, or 5324 of title 31, or
> of section 1956, 1957, or 1960 of [Title 18], shall order that the
> person forfeit to the United States any property, real or personal,
> involved in such offense, or any property traceable to such
> property.

12.     18 U.S.C. § 1956(a)(1), commonly known as the money laundering statute,

imposes a criminal penalty upon any person who,

> knowing that the property involved in a financial transaction represents the
> proceeds of some form of unlawful activity, conducts or attempts to conduct such

---

[1]     Title 28, United States Code, Section 2461(c) provides:

> If a person is charged in a criminal case with a violation of an Act
> of Congress for which the civil or criminal forfeiture of property is
> authorized, the Government may include notice of the forfeiture in
> the indictment or information pursuant to the Federal Rules of
> Criminal Procedure.  If the defendant is convicted of the offense
> giving rise to the forfeiture, the court shall order the forfeiture of
> the property as part of the sentence in the criminal case pursuant to
> the Federal Rules of Criminal Procedure and section 3554 of title
> 18, United States Code.  The procedures in section 413 of the
> Controlled Substances Act (21 U.S.C. 853) apply to all stages of a
> criminal forfeiture proceeding, except that subsection (d) of such
> section applies only in cases in which the defendant is convicted of
> a violation of such Act.

a financial transaction which in fact involves the proceeds of specified unlawful activity–

(A)    (i) with the intent to promote the carrying on of specified unlawful activity; or

        (ii) with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986; or

(B)    knowing that the transaction is designed in whole or in part–

        (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

        (ii) to avoid a transaction reporting requirement under State or Federal Law.

13.    Section 1956(a) further imposes a criminal penalty upon any person who:

(2) ... transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States--

(A) with the intent to promote the carrying on of specified unlawful activity; or

(B) knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part–

        (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

        (ii) to avoid a transaction reporting requirement under State or Federal law.

14.    Section 1956(f) provides that:

(f) There is extraterritorial jurisdiction over the conduct prohibited by this section if–

(1) the conduct is by a United States citizen or, in the case of a non-United States citizen, the conduct occurs in part in the United States; and

(2) the transaction or series of related transactions involves funds or monetary instruments of a value exceeding $10,000.

15.     Section 1957 of Title 18, United States Code, provides, in pertinent part, that "[w]hoever ... knowingly engages or attempts to engage in a monetary transaction [in the United States] in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity" shall be guilty of a crime.  A "monetary transaction" includes "the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument ... by, through, or to a financial institution ..."  18 U.S.C. § 1957(f)(1).

<u>Statutory Bases for Order of Seizure</u>

16.     The procedures applicable to criminal forfeitures of the proceeds of offenses constituting specified unlawful activity pursuant to 18 U.S.C. § 981(a)(1)(C) and 21 U.S.C. § 2461(c) are the procedures governing narcotics forfeitures, which are set out in 21 U.S.C. § 853 (other than § 853(d)).  *See* 28 U.S.C. § 2461(c).

17.     The same procedures apply to criminal forfeitures of property involved in money laundering activity pursuant to 18 U.S.C. § 982.  *See* 18 U.S.C. § 982(b)(1).

18.     To protect the ability of the United States to exercise its right of forfeiture, 21 U.S.C. § 853(e) empowers district courts to enter restraining orders and injunctions to preserve the availability of property subject to forfeiture.  Under Section 853(e)(1)(A), a restraining order may be obtained upon the filing of an indictment charging a violation for which criminal

forfeiture may be ordered and alleging that the property with respect to which the order is sought would, in the event of conviction, be subject to forfeiture.[2]

     19.     Pursuant to 21 U.S.C. § 853(f), where there is probable cause to believe that the property to be seized would, in the event of conviction, be subject to forfeiture, and a restraining order under 21 U.S.C. § 853(e) may not be sufficient to assure the availability of the property for forfeiture, the Court "shall issue a warrant authorizing the seizure of such property."[3]

     20.     Title 21, United States Code, Section 853(i) authorizes the Attorney General to "grant petitions for mitigation or remission of forfeiture, restore forfeited property to victims of a

---

[2]     Title 21, United States Code, Section 853(e)(1)(A) provides:

> Upon application of the United States, the court may enter a restraining order or injunction, require the execution of a satisfactory performance bond, or take any other action to preserve the availability of property described in subsection (a) of this section for forfeiture under this section --
>
>     (A)    upon the filing of an indictment or information charging a violation of this subchapter or subchapter II of this chapter for which criminal forfeiture may be ordered under this section and alleging that the property with respect to which the order is sought would, in the event of conviction, be subject to forfeiture under this section[.]

[3]     Title 21, United States Code, Section 853(f) provides that the Government may request the issuance of a seizure warrant in the same manner as provided for a search warrant:

> If the court determines that there is probable cause to believe that the property to be seized would, in the event of conviction, be subject to forfeiture and that an order under [21 U.S.C. § 853(e)] may not be sufficient to assure the availability of the property for forfeiture, the court shall issue a warrant authorizing the seizure of such property.

violation of this subchapter, or take any other action to protect the rights of innocent persons

which is in the interest of justice."

21.     Under 21 U.S.C. § 853(l), the district court has jurisdiction to enter restraining

orders under Section 853 "without regard to the location of any property which may be subject to

forfeiture under this section or which has been ordered forfeited under this section."

### The Subject Property

22.     Probable cause to believe the Subject Property would, in the event of conviction,

be subject to forfeiture as property purchased and/or maintained, directly and indirectly, with the

proceeds of offenses constituting specified unlawful activity – that is, mail fraud, wire fraud,

theft from an employee benefit plan and fraud in the sale of securities, and as property involved

in money laundering transactions, and property traceable to such property, is established by the

facts set forth in the attached affidavit of Special Agent Steven Garfinkel of the Federal Bureau

of Investigation (the "Garfinkel Affidavit").

### The Government's Application

23.     According to information obtained by the United States Marshals Service

("USMS"), the Subject Property is a large home on the Intracoastal Waterway, with

approximately 6,500 square feet of living space, five bedrooms, and seven bathrooms. An

exterior-only appraisal obtained by the USMS in March 2009 valued the Property at $7,450,000.

24.     Based on discussions with counsel for the defendant and Ruth Madoff, and

documents they provided to the Office, the undersigned are aware that (i) the homeowners

insurance policy on the Subject Property was cancelled by the carrier and is about to lapse; (ii)

the monthly expenses for the Subject Property (for the months since the defendant's arrest) are

8

significant, and include approximately $3,000 for the primary homeowners insurance policy,
$1,000 for power, water and electricity, $3,300 in maintenance and security costs; (iii) the annual
costs for hurricane and flood insurance exceed $115,000; and (iv) the Subject Property is not
occupied.

25.     On March 31, 2009, the Office learned that on March 30, 2009 a lawsuit was filed
in Connecticut state court by the Retirement Program for Employees of the Town of Fairfield,
Connecticut and others against MADOFF, Ruth Madoff, and others in connection with the city's
pension plans  alleged investments with funds which invested with BLMIS.  On filing the
complaint, the plaintiffs obtained an *ex parte* temporary restraining order which directs the
defendants, including MADOFF, Ruth Madoff and others, not to transfer or dissipate any of their
assets "other than in the ordinary course."  A copy of the temporary restraining order is attached
hereto as Exhibit C.

26.     At the time the Office learned of the Connecticut lawsuit, the Office had already
reached an agreement with the defendant and Ruth Madoff (through their counsel, Mauro Wolfe,
Esq., and other attorneys at Dickstein Shapiro LLP, representing the defendant, and Peter
Chavkin and Bridget Rohde, Esqs., of Mintz Levin Cohn Ferris Glovsky and Popeo PC,
representing Ruth Madoff) that the Subject Property should be sold to preserve its value pending
a final adjudication on the merits of the Government's forfeiture claim, that USMS would take
possession of, manage, market and sell the Subject Property, taking any necessary steps to
preserve its value pending the sale, and that the proceeds from the sale would serve as a
substitute res for the Subject Property in this action and any other action brought by the Office
for forfeiture of the Subject Property.  The Office and the defendant and Ruth Madoff, through

9

their counsel, were about to sign a stipulation of interlocutory sale to this effect on March 31,

2009, when counsel became aware of the Connecticut state order and counsel for the defendant

and Ruth Madoff advised the Office that they would not execute the stipulation for interlocutory

sale of the Subject Property pending their further review of the Connecticut state order. In light

of this situation and the fact that the Subject Property is about to be uninsured, on March 31,

2009, the undersigned advised counsel for the defendant and for Ruth Madoff that the Office

intended to move *ex parte* for an Order of Seizure allowing the USMS to seize the Subject

Property. Counsel stated that the Government may advise the Court that they take no position on

the Government's application herein.

27.     Based on the agreement that the USMS would take possession of and effect the

interlocutory sale of the Subject Property and the notice that the primary homeowner's insurance

policy would be canceled by the carrier effective on a date in or about mid-April 2009, the Office

declined to give counsel for Ruth Madoff approval to make the payment due April 1, 2009 on

that policy, which would cover the entire month of April. When this decision was made, it was

expected that the stipulation and order of interlocutory sale for the Property would have been

signed and endorsed and the USMS would take over the premises today. Because we do not

have a signed stipulation, *see* ¶ 26, *supra*, the Government makes this Application.

28.     The Government submits that the foregoing demonstrate exigent circumstances

supporting its application for an Order of Seizure to be executed immediately for the Subject

Property.

29.     It is the intention of the United States Attorney's Office for the Southern District

of New York (the "Office") to request that property forfeited in the above-captioned case against

10

Madoff be distributed *pro rata* to victims of the offenses described herein, pursuant to 21 U.S.C. § 853(i)(1) and 28 C.F.R. Part 9.

30.     Based on the past experiences of this Office, there is reason to believe that public filing of this Application and the Court's Order will jeopardize the availability of the assets in question for forfeiture. In this regard, the undersigned are aware of cases where there was no federal restraining order or other process filed against property subject to federal forfeiture and third parties obtained state court *ex parte* orders of pre-judgment attachment against the same property, thereby impeding the Government's efforts to restrain and/or seize the property for forfeiture and eventual restoration to defrauded investors on a *pro rata* basis.

31.     Following the Court's issuance of the Order of Seizure, the undersigned will provide a copy of the Order to the Madoffs's counsel and will advise them that the Order is under seal.

CONCLUSION

32.     For the foregoing reasons, the Government respectfully submits that the Court should issue a criminal seizure warrant pursuant to 21 U.S.C. § 853(f) because: (i) there is probable cause to believe that the Subject Property would, in the event of conviction, be subject to forfeiture, and (ii) an order under 21 U.S.C. § 853(e) will not be sufficient to assure the availability of the Subject Property for forfeiture.

33.     Due to the sensitive nature of the material contained in this Application and the affidavit submitted herewith, the Government respectfully requests that (i) the Garfinkel Affidavit, which contains non-public investigative details, be filed under seal until further order of the Court; and (ii) the Application and the Order of Seizure not be filed until the USMS has

11

secured the Subject Property (provided, however, that the Office, the USMS, its agent, or its designee may obtain and use copies of the Order of Seizure to the extent necessary to effectuate the terms and conditions of the Order). With the Court's permission, the Office will take the Application and Order to the Clerk for filing within three business hours of our receipt of notice that the Property has been secured.

Dated:  New York, New York
    April 1, 2009

Barbara A. Ward
Sharon E. Frase
Assistant United States Attorneys

# EXHIBIT A

Return to: (address self-addressed stamped envelope)
Name:  Karen T. Coney, Esq.
Address:  Edwards & Angell
250 Royal Palm Way
Palm Beach, Fl  33480

This Instrument Prepared By:
Name:  Karen T. Coney, Esq.
Address:  Edwards & Angell
250 Royal Palm Way
Palm Beach, FL  33480

Property Appraisers Parcel Identification (Folio) Number(s):
50 43 43 14 04 002 0024

Grantee(s) S.S. #(s)

WARRANTY DEED
INDIVD. TO INDIVD.

RAMCO FORM NO. 01

NR-01-1994  4:24pm 94-071548
ORB  8144 Pg 1200
Con  3,800,000.00  Doc  26,600.00
RECORD VERIFIED   DOROTHY H WILKEN
CLERK OF THE COURT - PB COUNTY, FL

SPACE ABOVE THIS LINE FOR PROCESSING DATA    SPACE ABOVE THIS LINE FOR RECORDING DATA

**This Warranty Deed,** Made the 1st day of March, A.D. 19 94, by

Michael C. Burrows, a single man with an address at 410 North Lake Way, Palm Beach, FL  33480

hereinafter called the Grantor, to  Ruth Madoff, a married woman

whose post office address is  133 East 64th Street, New York, NY    10021

hereinafter called the Grantee:

(Wherever used herein the terms "Grantor" and "Grantee" include all the parties to this instrument and the heirs, legal representatives and assigns of individuals, and the successors and assigns of corporations, wherever the context so admits or requires.)

**Witnesseth,** That the Grantor, for and in consideration of the sum of $  10.00    and other valuable considerations, receipt whereof is hereby acknowledged, hereby grants, bargains, sells, aliens, remises, releases, conveys and confirms unto the Grantee all that certain land, situate in  Palm Beach
County, State of  Florida    , viz:

The South 84.51 feet of the North 199.51 feet of that part of Lot B, amended Plat of Miramar Plan, according to the Plat thereof, as recorded in Plat Book 6, Page 55 of the Public Records of Palm Beach County, Florida, lying west of Lake Way, a Public thoroughfare in the Town of Palm Beach, Florida.
Subject to conditions, restrictions, reservations and easements of record: taxes for the year 1994 and all subsequent years.

**Together,** with all the tenements, hereditaments and appurtenances thereto belonging or in anywise appertaining.

**To Have and to Hold,** the same in fee simple forever.

**And** the Grantor hereby covenants with said grantee that the grantor is lawfully seized of said land in fee simple; that the grantor has good right and lawful authority to sell and convey said land; and hereby warrants the title to said land and will defend the same against the lawful claims of all persons whomsoever; and that said land is free of all encumbrances, except taxes accruing subsequent to December 31, 19 93.

**In Witness Whereof,** the said Grantor has signed and sealed these presents the day and year first above written.

Signed, sealed and delivered in the presence of:

Witness Signature (as to First Grantor)

Karen T. Coney
Printed Name

Witness Signature (as to First Grantor)

A. PAUL PROSPERI
Printed Name

Michael C. Burrows
Printed Name
410 North Lake Way, Palm Beach, Fl  33480
Post Office Address

Witness Signature (as to Co-Grantor, if any)

Printed Name

Co-Grantor Signature, if any
Printed Name

Witness Signature (as to Co-Grantor, if any)

Printed Name

Post Office Address

STATE OF  FLORIDA
COUNTY OF  PALM BEACH

I hereby Certify that on this day, before me, an officer duly authorized to administer oaths and take acknowledgments, personally appeared

Michael C. Burrows, a single man

known to me to be the person____ described in and who executed the foregoing instrument, who acknowledged before me that he executed the same, and an oath was not taken. (Check one:) ☑ Said person(s) is/are personally known to me. ☐ Said person(s) provided the following type of identification:

NOTARY RUBBER STAMP SEAL

Witness my hand and official seal in the County and State last aforesaid this

1st day of March A.D. 19 94.

Notary Signature  Judith E. Logsdon

Printed Notary Signature  JUDITH E. LOGSDON



OFFICIAL SEAL
JUDITH E. LOGSDON
Notary Public State of Florida
Commission No. CC 298453
Expires June 29, 1997

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - x

JUDGE CHIN

**09 CRIM 213**

UNITED STATES OF AMERICA           :

**INFORMATION**

    -v-                            :

09 Cr.

BERNARD L. MADOFF,                 :

        Defendant.               :

USDC SDNY
DOCUMENT
ELECTRONICALLY
DOC. #: _____
DATE FILED: MAR 1 0 2009

- - - - - - - - - - - - - - - - x

**COUNT ONE**
(Securities Fraud)

The United States Attorney charges:

**Relevant Persons and Entities**

1.    At all times relevant to this Information, Bernard
L. Madoff Investment Securities LLC, and its predecessor, Bernard
L. Madoff Investment Securities (collectively and separately,
"BLMIS"), had its principal place of business in New York, New
York, most recently at 885 Third Avenue, New York, New York.
BLMIS was a broker-dealer that engaged in three principal types
of business:  market making; proprietary trading; and investment
advisory services.  BLMIS was registered with the United States
Securities and Exchange Commission ("SEC") as a broker-dealer and
was, beginning in or about 2006, registered with the SEC as an
investment adviser.

2.    At all times relevant to this Information, Madoff
Securities International Ltd. ("MSIL") was a corporation

incorporated in the United Kingdom.  MSIL was an affiliate of

BLMIS which engaged principally in proprietary trading.

3.    BERNARD L. MADOFF, the defendant, was the founder

of BLMIS, and served as its sole member and principal.  In that

capacity, MADOFF controlled the business activities of BLMIS.

MADOFF owned the majority of the voting shares of MSIL, and

served as the Chairman of MSIL's Board of Directors.  MADOFF also

served on the Board of Directors of the National Association of

Securities Dealers Automated Quotations ("NASDAQ"), and for a

period served as the Chairman of NASDAQ.

## The Scheme to Defraud

4.    From at least as early as the 1980s through on or

about December 11, 2008, BERNARD L. MADOFF, the defendant,

perpetrated a scheme to defraud the clients of BLMIS by

soliciting billions of dollars of funds under false pretenses,

failing to invest investors' funds as promised, and

misappropriating and converting investors' funds to MADOFF's own

benefit and the benefit of others without the knowledge or

authorization of the investors.

5.    To execute the scheme, MADOFF solicited and caused

others to solicit prospective clients to open trading accounts

with BLMIS, based upon, among other things, his promise to use

investor funds to purchase shares of common stock, options and

other securities of large, well-known corporations, and

2

representations that he would achieve high rates of return for clients, with limited risk.  In truth and in fact, as MADOFF well knew, these representations were false.  MADOFF failed to honor his promises to BLMIS clients by, among other things, failing to invest the BLMIS investment advisory clients' funds in securities as he had promised.  Instead, notwithstanding his promises to the contrary, and notwithstanding representations that MADOFF made and caused to be made on tens of thousands of account statements and other documents sent through the United States Postal Service to BLMIS clients throughout the operation of this scheme, MADOFF operated a massive Ponzi scheme in which client funds were misappropriated and converted to the use of MADOFF, BLMIS, and others.

6.    In connection with this Ponzi scheme, BERNARD L. MADOFF, the defendant, accepted billions of dollars of investor money, cumulatively, from individual investors, charitable organizations, trusts, pension funds, and hedge funds, among others, and established on their behalf thousands of accounts at BLMIS.  From the outset of the scheme, and continuing throughout its operation, MADOFF obtained investor funds through interstate wire transfers from financial institutions located outside New York State and through mailings delivered by the United States Postal Service.

3

7.     In the course of carrying out this scheme, BERNARD
L. MADOFF, the defendant, made, and caused others to make, false
representations concerning his investment strategies to clients
and prospective clients of BLMIS.  Among other things, MADOFF
marketed to clients and prospective clients an investment
strategy referred to as a "split strike conversion" strategy.
Clients were promised that BLMIS would invest their funds in a
basket of approximately 35-50 common stocks within the Standard &
Poor's 100 Index (the "S&P 100"), a collection of the 100 largest
publicly traded companies in terms of their market
capitalization.  MADOFF claimed that he would select a basket of
stocks that would closely mimic the price movements of the S&P
100.  MADOFF further claimed that he would opportunistically time
those purchases, and would be "out of the market" intermittently,
investing clients' funds in these periods in United States
Government-issued securities such as United States Treasury
bills.  MADOFF also claimed that he would hedge the investments
that he made in the basket of common stocks by using investor
funds to buy and sell option contracts related to those stocks,
thereby limiting potential losses caused by unpredictable changes
in stock prices.

8.     Further, to induce new and continued investments
by clients and prospective clients, MADOFF promised certain
clients annual returns in varying amounts up to at least

4

approximately 46 percent per year.  MADOFF also told certain clients that the fee for his services would be based on an approximately $0.04 per share commission on the stocks that MADOFF traded for such clients.

9.   Contrary to his promises to those clients that he would use their funds to purchase securities on their behalf, and would invest client funds pursuant to the strategies he had marketed, MADOFF used most of the investors' funds to meet the periodic redemption requests of other investors.  In addition, MADOFF took some of these clients' investment funds as "commissions," which he used to support the market making and proprietary trading businesses of BLMIS, and from which he and others received millions of dollars in benefits.

10.   BERNARD L. MADOFF, the defendant, created and caused to be created a broad infrastructure at BLMIS to generate the impression and support the appearance that BLMIS was operating a legitimate investment advisory business in which client funds were actively traded as he had promised, and to conceal the fact that no such business was actually being conducted.  Among other things, MADOFF hired numerous employees to serve as a "back office" for this investment advisory business.  Many of the employees hired to perform those functions had little or no prior pertinent training or experience in the securities industry.  MADOFF caused those BLMIS employees to,

among other things, communicate with clients and generate false
and fraudulent documents including, but not limited to, monthly
client account statements and trade confirmations that
purportedly reflected the purchases and sales of securities that
MADOFF claimed had been conducted on behalf of BLMIS's clients.
MADOFF further caused account statements and trade confirmations
that were sent to clients to reflect fictitious returns
consistent with the returns that had been promised to those
clients.

       11.   Moreover, to support BLMIS's market making and
proprietary trading businesses, between at least as early as in
or about 2002 and in or about 2008, BERNARD L. MADOFF, the
defendant, caused more than $250 million of BLMIS investment
advisory clients' funds to be directed, through a series of wire
transfers, to the operating accounts that funded the operations
of these businesses.  Specifically, MADOFF caused those investor
funds to be sent from a BLMIS account in New York, New York (the
"BLMIS Client Account"), to accounts held by MSIL in London,
United Kingdom (the "MSIL Accounts"), and further caused funds to
be transferred from the MSIL Accounts to either the BLMIS Client
Account or to another bank account in New York, New York, which
was principally used to fund BLMIS's operations (the "BLMIS
Operating Account").  MADOFF directed these funds transfers, in
part, to give the appearance that he was conducting securities

transactions in Europe on behalf of the investors when, in fact, he was not conducting such transactions.  MADOFF also directed the transfer of funds from the MSIL Accounts to purchase and maintain property and services for the personal use and benefit of MADOFF, his family members and associates.

12.  To conceal his scheme, BERNARD L. MADOFF, the defendant, among other things, withheld information from regulators and repeatedly lied to the SEC in written submissions and in sworn testimony.

13.  In furtherance of the scheme, BERNARD L. MADOFF, the defendant, caused false and fraudulent certified financial statements for BLMIS, including balance sheets, statements of income, statements of cash flows, and reports on internal control, to be created.  MADOFF further caused such false and fraudulent financial statements to be sent to clients and prospective clients through the United States Postal Service, and also caused such false and fraudulent financial statements to be filed with the SEC.  Among other things, MADOFF knew that the certification attached to the BLMIS financial statements falsely averred that those statements had been prepared in accordance with Generally Accepted Auditing Standards and Generally Accepted Accounting Principles.

14.  As of on or about November 30, 2008, BLMIS had approximately 4,800 client accounts.  On or about December 1,

2008, BLMIS issued account statements for the calendar month of November 2008 reporting that those client accounts held a total balance of approximately $64.8 billion.  In fact, BLMIS held only a small fraction of that balance on behalf of its clients.

### Statutory Allegation

15.    From at least the 1980s through on or about December 11, 2008, in the Southern District of New York and elsewhere, BERNARD L. MADOFF, the defendant, unlawfully, willfully, and knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, in connection with the purchase and sale of securities, did use and employ manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in transactions, acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons.

(Title 15, United States Code, Sections 78j(b) and 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5;
Title 18 United States Code, Section 2.)

8

## COUNT TWO
(Investment Adviser Fraud)

The United States Attorney further charges:

16.   The allegations contained in paragraphs 1 through 14, above, are hereby repeated, realleged and incorporated by reference as if fully set forth herein.

17.   From at least the 1980s through on or about December 11, 2008, in the Southern District of New York and elsewhere, BERNARD L. MADOFF, the defendant, acting as an investment adviser with respect to clients and potential clients of BLMIS, unlawfully, willfully, and knowingly, by the use of the mails and means and instrumentalities of interstate commerce, directly and indirectly, did: (a) employ devices, schemes, and artifices to defraud clients and prospective clients; (b) engage in transactions, practices, and courses of business which operated as a fraud and deceit upon clients and prospective clients; and (c) engage in acts, practices, and courses of business that were fraudulent, deceptive, and manipulative.

(Title 15, United States Code, Sections 80b-6 and 80b-17;
Title 18, United States Code, Section 2.)

## COUNT THREE
(Mail Fraud)

The United States Attorney further charges:

18.   The allegations contained in paragraphs 1 through 14, above, are hereby repeated, realleged and incorporated by reference as if fully set forth herein.

9

19.   From at least as early as the 1980s through on or about December 11, 2008, in the Southern District of New York and elsewhere, BERNARD L. MADOFF, the defendant, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, for the purpose of executing such scheme and artifice and attempting so to do, did place in post offices and authorized depositories for mail matter, matters and things to be sent and delivered by the Postal Service, and did deposit and cause to be deposited matters and things to be sent and delivered by private and commercial interstate carriers, and did take and receive therefrom such matters and things, and did knowingly cause to be delivered, by mail and such carriers according to the directions thereon, and at the places at which they were directed to be delivered by the persons to whom they were addressed, such matters and things, to wit, on or about December 1, 2008, MADOFF sent and caused to be sent and delivered via the Postal Service a false and fraudulent account statement from BLMIS to a client in New York, New York.

(Title 18, United States Code, Sections 1341 and 2.)

10

## COUNT FOUR
(Wire Fraud)

The United States Attorney further charges:

20.   The allegations contained in paragraphs 1 through 14, above, are hereby repeated, realleged and incorporated by reference as if fully set forth herein.

21.   From at least as early as the 1980s through on or about December 11, 2008, in the Southern District of New York and elsewhere, BERNARD L. MADOFF, the defendant, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money by means of false and fraudulent pretenses, representations and promises, did transmit and cause to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, on or about August 5, 2008, MADOFF caused approximately $2 million of investor funds to be sent by wire from Bloomington, Minnesota to New York, New York.

(Title 18, United States Code, Sections 1343 and 2.)

11

**COUNT FIVE**
(International Money Laundering To Promote
Specified Unlawful Activity)

The United States Attorney further charges:

22.    The allegations contained in paragraphs 1 through 14, above, are hereby repeated, realleged and incorporated by reference as if fully set forth herein.

23.    From at least as early as in or about 2002, through on or about December 11, 2008, in the Southern District of New York, the United Kingdom, and elsewhere, BERNARD L. MADOFF, the defendant, in an offense involving and affecting interstate and foreign commerce, unlawfully, willfully and knowingly, transported, transmitted and transferred, attempted to transport, transmit and transfer, and caused others to transport, transmit and transfer, and attempt to transport, transmit, and transfer, funds from a place in the United States to a place outside the United States, and funds from a place outside the United States to a place within the United States, with the intent to promote the carrying on of specified unlawful activity, to wit, fraud in the sale of securities, mail fraud, wire fraud, and theft from an employee benefit plan, to wit, MADOFF caused funds to be wire transferred from BLMIS bank accounts, including the BLMIS Investor Account in New York, New York, to the MSIL Accounts in London, England, in the United Kingdom, and to be transferred from the MSIL Accounts in London, England, in the

12

United Kingdom, to BLMIS bank accounts, including the BLMIS

Operating Account, in New York, New York, in order to promote

fraud in the sale of securities, mail fraud, wire fraud, and

theft from an employee benefit plan.

(Title 18, United States Code, Sections 1956(a)(2)(A) and 2.)

### COUNT SIX
(International Money Laundering To Conceal And Disguise
The Proceeds of Specified Unlawful Activity)

The United States Attorney further charges:

24.   The allegations contained in paragraphs 1 through

14, above, are hereby repeated, realleged and incorporated by

reference as if fully set forth herein.

25.   From at least as early as in or about 2002,

through on or about December 11, 2008, in the Southern District

of New York, the United Kingdom, and elsewhere, BERNARD L.

MADOFF, the defendant, in an offense involving and affecting

interstate commerce, knowing that the property involved in

certain financial transactions, to wit, investor funds in the

custody and care of BLMIS, represented the proceeds of some form

of unlawful activity, unlawfully, willfully and knowingly would

and did conduct and attempt to conduct such financial

transactions which in fact involved the proceeds of specified

unlawful activities, to wit, fraud in the sale of securities,

mail fraud, wire fraud, and theft from an employee benefit plan,

knowing that the transactions were designed in whole and in part

to conceal and disguise the nature, the location, the source, the

13

ownership and the control of the proceeds of said specified
unlawful activity.

26. Such financial transactions included, but were not
limited to, the following:

a. From at least in or about 2006, through on or
about December 11, 2008, BERNARD L. MADOFF, the defendant, caused
funds to be wire transferred from BLMIS bank accounts in New
York, New York, including the BLMIS Investor Account, to the MSIL
Accounts in London, England, in the United Kingdom, and
thereafter to be transferred from the MSIL Accounts in the United
Kingdom to BLMIS bank accounts in New York, New York, including
the BLMIS Investor Account and the BLMIS Operating Account, which
transfers were designed to give the false and fraudulent
appearance that BLMIS was operating a legitimate investment
advisory business in which client funds were being used to
purchase and sell securities as MADOFF had promised, and to
conceal the fact that no such purchases or sales were actually
being made; and

b. From at least in or about 2002, through on or
about December 11, 2008, MADOFF caused funds to be wire
transferred from BLMIS bank accounts in New York, New York,
including the BLMIS Investor Account, to the MSIL Accounts in
London, England, in the United Kingdom, and thereafter to be
transferred from the MSIL Accounts in the United Kingdom to

14

purchase and maintain property and services for the personal use
and benefit of MADOFF, his family members and associates.

(Title 18, United States Code, Sections
1956(a)(1)(B)(i) & (f) and 2.)

## COUNT SEVEN
(Money Laundering)

The United States Attorney further charges:

27.  The allegations contained in paragraphs 1 through
14, above, are hereby repeated, realleged and incorporated by
reference as if fully set forth herein.

28.  From at least in or about the 1980s, through on or
about December 11, 2008, in the Southern District of New York and
elsewhere, BERNARD L. MADOFF, the defendant, in an offense
involving and affecting interstate and foreign commerce,
unlawfully, willfully, and knowingly engaged and attempted to
engage in and cause others to engage in a monetary transaction in
criminally derived property that was of a value greater than
$10,000 and was derived from specified unlawful activity; to wit,
on or about April 13, 2007, MADOFF caused approximately
$54,485,750 derived from fraud in the sale of securities, mail
fraud, wire fraud, and theft from an employee benefit plan, to be
transferred from the BLMIS Investor Account in New York, New
York, to one of the BLMIS Accounts in London, England, in the
United Kingdom.

(Title 18, United States Code, Sections 1957 and 2.)

15

## COUNT EIGHT
(False Statements)

The United States Attorney further charges:

29.    The allegations contained in paragraphs 1 through 14, above, are hereby repeated, realleged and incorporated by reference as if fully set forth herein.

30.    Beginning in or about 2006, as described in paragraph 1 above, BLMIS was, among other things, an investment adviser registered with the SEC.  As such, BLMIS was subject to periodic examinations by the SEC, and was required to file an SEC Form ADV Uniform Application for Investment Adviser Registration ("ADV").

31.    On or about January 7, 2008, BERNARD L. MADOFF, the defendant, filed and caused to be filed an ADV with the SEC (the "BLMIS ADV").  The BLMIS ADV was signed by MADOFF, who certified, under penalty of perjury under the laws of the United States, that the information and statements made therein were true and correct, and that he was signing the BLMIS ADV as a free and voluntary act.

32.    The BLMIS ADV contained false statements made for the purpose of deceiving the SEC and hiding the defendant's unlawful conduct described in paragraphs 4 through 14, above. The BLMIS ADV filed with the SEC stated, among other things, in substance, that BLMIS had custody of advisory clients' securities.

16

33.   On or about January 7, 2008, in the Southern District of New York, BERNARD L. MADOFF, the defendant, unlawfully, willfully, and knowingly, in a matter within the jurisdiction of the executive branch of the Government of the United States, namely, the SEC, made materially false, fictitious, and fraudulent statements and representations, to wit, MADOFF filed the BLMIS ADV with the SEC, in which he made the following false statement that was material to the SEC's oversight of BLMIS's investment adviser business:

### Specification

MADOFF falsely stated that BLMIS had "custody of . . . advisory clients' . . . securities."

(Title 18, United States Code, Section 1001(a).)

### COUNT NINE
(Perjury)

The United States Attorney further charges:

34.   The allegations contained in paragraphs 1 through 14, above, are hereby repeated, realleged and incorporated by reference as if fully set forth herein.

35.   As described in paragraph 1 above, BLMIS was at certain times, among other things, a broker-dealer and investment adviser registered with the SEC.  As such, BLMIS was subject to periodic examinations by the SEC.  The SEC has broad authority to conduct investigations into various aspects of the securities markets and, in or about 2006, was conducting such an

17

investigation. As part of that investigation, on or about May 19, 2006, employees of the SEC took the voluntary testimony of BERNARD L. MADOFF, the defendant, under oath (the "MADOFF SEC Testimony").

36.    During the course of the MADOFF SEC Testimony, BERNARD L. MADOFF, the defendant, made numerous false and misleading statements for the purpose of deceiving the SEC and hiding his unlawful conduct described in paragraphs 4 through 11, above.  MADOFF testified, among other things, in substance, that: (a) BLMIS executed trades of common stock on behalf of its investment advisory clients; (b) BLMIS executed options contracts on behalf of its investment advisory clients; (c) BLMIS had custody of the assets managed on behalf of its investment advisory clients; and (d) BLMIS used the same trading strategy for all its investment advisory clients.

37.    On or about May 19, 2006, in the Southern District of New York, BERNARD L. MADOFF, the defendant, having taken an oath before a competent tribunal, officer and person, in a case in which the law of the United States authorizes an oath to be administered, namely, in testimony before an officer of the SEC, that he would testify, declare, depose and certify truly, and that any written testimony, declaration, deposition and certificate by him subscribed, would be true, unlawfully, willfully, knowingly, and contrary to such oath, stated and subscribed material matters which he did not believe to be true,

18

namely, in his testimony on or about May 19, 2006, MADOFF

knowingly testified falsely as to the material matters in the

portions of his cited testimony underlined below:

### Specification One
(Page 55, Lines 20-25)

Q:  Let's just get back to some of the basics that we
discussed before. You mentioned earlier that the
basket in the institutional trading business may be
hedged with options. Does that in fact happen?

A:  <u>Yes</u>.

### Specification Two
(Page 57, Lines 15-20)

Q:  Let's focus on the actual execution portion of it.
Let's go back to the equities. You mentioned that you
used this AHOE system, and you mention[ed] that it
exposes a sliced order to the European market. Is it
correct then that the equities are traded in Europe?

A:  <u>Yes</u>.

### Specification Three
(Page 63, Lines 11-23)

Q:  Now you mentioned that there was a group of dealers to
whom you put out this indication of interest each time.
Generally, with how many of them do you end up trading
in each execution?

A:  <u>Within the basket, we're probably interacting with 40,
close to 50</u>.

Q:  That's for equities and options.

A:  <u>Equities. Options is a dozen</u>.

Q:  A dozen. Do all of them end up trading usually?

A:  <u>Pretty much. They all trade on a - yes. It's usually
that they all participate during the trading. They
have an interest in these stocks. These stocks are the
marketplace.</u>

19

### Specification Four
(Page 65, Lines 16-18)

Q:   Who are the counterparties to the options contracts?

A:   They're basically European banks.

### Specification Five
(Page 66, Line 19 - Page 67, Line 20)

Q:   So how does the time frame for the options trading
     relate to the time frame for the equities trading?

A:   First we're putting the equity basket on, and then
     we're putting the options on after the equity basket is
     complete, so the options are being done basically in
     the morning typically between 8:00 and 9:00 a.m.

. . . .

Q:   With the options trades, is there any documentation
     generated?  For example, for some derivatives, there is
     an after agreement and you have a confirmation, a 2-
     page document.  Is there something like that for the
     options trades?

A:   Yes, there's an affirmation that's generated
     electronically, and there's a master option agreement
     that's attached to that that's also electronic.

Q:   And the electronic affirmation stores data for each
     trade with each particular dealer.

A:   Correct.

Q:   So if you wanted to find out with whom you bought these
     contracts on a particular day, that's where you would
     go.

A:   Right.

### Specification Six
(Page 85, Lines 2-3)

Q:   Who has the custody of the assets?

A:   We do.

## Specification Seven
(Page 116, Line 17 - Page 117, Line 2)

Q:    I wanted to go back to the question that [an SEC
      attorney] asked you about other persons, persons other
      than the institutional customers that we discussed so
      far and proprietary situations.  The trading for these
      persons, is it also pursuant to the same strategy [as]
      in the institutional trading business?

A:    <u>Yes</u>.

Q:    What is approximately the total amount of assets traded
      for these persons?

A:    My guess would be something, <u>a few hundred million
      dollars</u>.

      (Title 18, United States Code, Section 1621.)

### COUNT TEN
(False Filing With The Securities And Exchange Commission)

        38.   The allegations contained in paragraphs 1 through

14, above, are hereby repeated, realleged and incorporated by

reference as if fully set forth herein.

        39.   On or about December 20, 2007, in the Southern

District of New York, BERNARD L. MADOFF, the defendant,

unlawfully, willfully, and knowingly, in applications, reports,

and documents required to be filed with the SEC under the

Securities Exchange Act of 1934, and the rules and regulations

thereunder, did make and cause to be made statements that were

false and misleading with respect to material facts, to wit,

21

MADOFF caused a false and misleading certified BLMIS audit report to be filed with the SEC.

(Title 15, United States Code, Sections 78q(e) and 78ff;
Title 17, Code of Federal Regulations, Sections 240.17a-5,
240.17a-13 and 210.2-01; Title 18, United States Code,
Section 2.)

## COUNT ELEVEN
(Theft From An Employee Benefit Plan)

40. The allegations contained in paragraphs 1 through 14, above, are hereby repeated, realleged and incorporated by reference as if fully set forth herein.

41. From at least as early as the 1990s through on or about December 11, 2008, in the Southern District of New York and elsewhere, BERNARD L. MADOFF, the defendant, unlawfully, willfully, and knowingly, embezzled, stole, abstracted and converted to his own use, and to the use of others, moneys, funds, securities, premiums, credits, properties, and other assets of employee welfare benefit plans and employee pension benefit plans and funds connected therewith, to wit, on or about September 24, 2008, MADOFF failed to invest as promised approximately $10 million in pension fund assets sent to BLMIS by a master trust on behalf of approximately 35 labor union pension plans, and instead converted those funds to his use and the use of others.

(Title 18, United States Code, Sections 664 and 2.)

22

## FORFEITURE ALLEGATION
(Offenses Constituting Specified Unlawful Activity)

42. As the result of committing the offenses
constituting specified unlawful activity as defined in 18 U.S.C.
§ 1956(c)(7), as alleged in Counts One, Three, Four, and Eleven
of this Information, BERNARD L. MADOFF, the defendant, shall
forfeit to the United States, pursuant to 18 U.S.C.
§ 981(a)(1)(C) and 28 U.S.C. § 2461, all property, real and
personal, that constitutes or is derived from proceeds traceable
to the commission of the said offenses.

### Substitute Asset Provision

43. If any of the above-described forfeitable
property, as a result of any act or omission of the defendant:

     a.    cannot be located upon the exercise of due
diligence;

     b.    has been transferred or sold to, or deposited
with, a third person;

     c.    has been placed beyond the jurisdiction of
the Court;

     d.    has been substantially diminished in value;
or

     e.    has been commingled with other property which
cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21,
United States Code, Section 853(p), to seek forfeiture of any

23

other property of the defendant up to the value of the
forfeitable property described above.

(Title 18, United States Code, Sections 981(a)(1)(C),
and Title 28, United States Code, Section 2461.)

### FORFEITURE ALLEGATION
(Money Laundering)

44. As the result of committing one or more of the
money laundering offenses in violation of 18 U.S.C. §§ 1956
and 1957, alleged in Counts Five through Seven of this
Information, BERNARD L. MADOFF, the defendant, shall forfeit to
the United States, pursuant to 18 U.S.C. § 982, all property,
real and personal, involved in the said money laundering offenses
and all property traceable to such property.

#### Substitute Asset Provision

45. If any of the above-described forfeitable

property, as a result of any act or omission of the defendant:

    a.   cannot be located upon the exercise of due
        diligence;

    b.   has been transferred or sold to, or deposited
        with, a third person;

    c.   has been placed beyond the jurisdiction of
        the Court;

    d.   has been substantially diminished in value;
        or

    e.   has been commingled with other property which
        cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18,
United States Code, Section 982(b) and Title 21, United States

24

Code, Section 853(p), to seek forfeiture of any other property of
the defendant up to the value of the forfeitable property
described above.

(Title 18, United States Code, Section 982.)

LEV L. DASSIN
Acting United States Attorney

25

# EXHIBIT C

FBT CV 09 3023735

RETURN DATE: APRIL 21, 2009                    :

RETIREMENT PROGRAM FOR                         :    SUPERIOR COURT
EMPLOYEES OF THE TOWN OF
FAIRFIELD; RETIREMENT PROGRAM                   :
FOR POLICE OFFICERS AND FIREMEN
OF THE TOWN OF FAIRFIELD; AND                   :
TOWN OF FAIRFIELD
                                               :
VS.                                                 J.D. OF FAIRFIELD
                                               :    AT BRIDGEPORT
BERNARD L. MADOFF; TREMONT
PARTNERS, INC.; TREMONT GROUP                   :
HOLDINGS, INC.; OPPENHEIMER
ACQUISITION CORP.; MAXAM CAPITAL               :
MANAGEMENT, LLC; MAXAM CAPITAL
GP LLC; MAXAM CAPITAL MANAGEMENT               :
LIMITED; SANDRA L. MANZKE; ROBERT I.
SCHULMAN; WALTER M. NOEL, JR.;                  :
JEFFREY H. TUCKER; ANDRES
PIEDRAHITA; PETER B. MADOFF; RUTH               :
MADOFF; MARK MADOFF AND ANDREW                      MARCH 30, 2009
MADOFF                                          :

## TEMPORARY RESTRAINING ORDER

**WHEREAS**, Plaintiffs Retirement Program for Employees of the Town of

Fairfield, Retirement Program for Police Officers and Firemen of the Town of Fairfield,

and Town of Fairfield's (hereinafter "Plaintiffs") Application for Prejudgment Remedy

and for Temporary Restraining Order having been presented to the Court, and the Court

having considered Plaintiffs' Complaint, together with the supporting Affidavit of Edward H. Siedle, Kenneth A. Flotb and Nancy Novas-Brown.

**NOW, THEREFORE**, the Court does hereby order, adjudge and decree as follows:

Defendants shall not dissipate, transfer, convey, hypothecate, encumber, dispose of or spend, other than in the ordinary course, any of their assets, including, but not limited to those as follows:

(a)     any real property owned by any of the Defendants and any further real property identified pursuant to Defendants' disclosure to Plaintiffs' Motion for Disclosure of Assets;

(b)     the interest of Andrew H. Madoff in 57 Tomac Avenue, Greenwich, Connecticut, as more particularly described in Exhibit A;

(c)     the interest of Mark D. Madoff in 21 Cherry Valley Road, Greenwich, Connecticut, as more particularly described in Exhibit B;

(d)     the interest of Walter M. Noel, Jr. in 175 Round Hill Road, Greenwich, Connecticut, as more particularly described in Exhibit C;

(e)     all accounts at any financial institution in which any of the Defendants maintain an interest, including, but not limited to, accounts at any of the financial institutions listed on Exhibit D attached hereto;

(f)     all such other assets, property, or obligations held by or on behalf of any of the Defendants as may hereafter be identified by Defendants' disclosure pursuant to Plaintiffs' Motion for Disclosure of Assets; and

(g)     any and all personal property held by the Defendants, including but not limited to stock certificates or other certificated securities of the

2

Defendants, wherever located, and Defendants are further ordered to turn over such stock certificates or certificated securities pursuant to Conn. Gen. Stat. § 42a-8-112(e) formerly Conn. Gen. Stat. § 42a-8-317(6)).

(h)    Any other assets in any of the Defendants' possession, custody or control.

*See Connecticut Savings Bank v. Realty Capital Acquisition Corp et al., ***

Dated at Bridgeport, Connecticut, this 30th day of ___MARCH___, 2009.

BY THE COURT ( Hiller , J.)

_____
JUDGE/Clerk/Asst. Clerk

**\* Superior Court, j.d. of New Haven, Docket No. 294971 (July 24, 1990, Hodgson, j.)**

Bridgeport/38220.22/AJW/749740v1

3

# Exhibit  A

ALL THAT CERTAIN TRACT, PIECE OR PARCEL OF LAND, together with the buildings and the other improvements thereon, situated at Old Greenwich, in the Town of Greenwich, County of Fairfield and State of Connecticut, as more particularly bounded and described as follows:

NORTHERLY:  200.00 feet, more or less, by land now or formerly of Karl A. Brautigam and Harriet K. Brautigam and land now or formerly of Harold Pruner and Billy Ann Pruner.

EASTERLY:  60.00 feet, by land now or formerly of Harold Pruner and Billy Ann Pruner.

SOUTHERLY:  200.00 feet, more or less, by land now or formerly of Robert A. Budington, Jr., and,

WESTERLY:  60.00 feet by Tomac Avenue, to the point or place of beginning.

Bridgeport/38220.22/AJW/751936v1

# Exhibit B

ALL that certain tract, piece or parcel of land, together with the buildings and improvements thereon, situated in the Town of Greenwich, County of Fairfield and State of Connecticut, bounded and described as follows:

Beginning, at that point formed by the intersection of the division line between land now or formerly of William A. Sweeney and land now or formerly of the Greenwich Water Company with the easterly line of Cherry Valley Road ; and running thence along land now or formerly of the Greenwich Water Company North 6° 23′ East 37.4 feet, North 33° 47′ East 11.4 feet, North 88° 00′ East 19.4 feet , North 39° 41 East 18.7 feet, North 18° 03′ East 14.0 feet, North 10° 23′ West 26.5 feet, North 26° 15′ West 55.7 feet, North 16° 20′ West 56.0 feet, North 21° 40′ West 47.4 feet, North 43° 45′ West 25.4 feet, North 20° 51′ West 32.0 feet, North 46° 39′ East 25.9 feet, North 34° 29′ East 77.1 feet, North 48° 16′ West 16.75 feet, North 28° 39′ East 76.0 feet, North 35° 15′ East 24.0 feet, North 29° 30′ East 62.3 feet, North 23° 24′ East 45.6 feet, North 10° 21′ East 20.05 feet, North 10° 55′ West 51.85 feet, North 1° 49′ West 13.5 feet, North 5° 20′ East 43.5 feet, North 19° 13′ East 10.05 feet, North 32° 45′ East 51.2 feet and South 78° 22′ East 281.0 feet, thence along land now or formerly of William A. Sweeny South 9° 36′ 10" West 499.6 feet, South 5° 32′ East 144.21 feet and South 58° 18′ 50" West 358.5 feet to the easterly line of Cherry Valley Road, thence northerly along the easterly line of Cherry Valley Road North 21° 59′ West 81.6 feet and North 2° 21′ West 53.6 feet to the point of beginning and containing 5.641 acres.

The general boundaries of the above-described tract of land are northerly by land now or formerly of the Greenwich Water Company; southerly and easterly by land land now or formerly of William A. Sweeny; westerly by Cherry Valley Road and land now or formerly of the Greenwich Water Company.

Together with all the right, title and interest in and to so much of the highway, Cherry Valley Road, as lies in front of and adjoining said premises to the center line thereof.

Together with the right of using for the purpose of boating, swimming, and/or fishing, that portion of the lake which lies in the front of said premises, together with any right, if any, to the other portion of the lake.

SAID PREMISES being known as 21 Cherry Valley Road.

Bridgeport/38220.22/AJW/752022v1

# Exhibit C

BK5332PG0185

LEGAL DESCRIPTION

175 Round Hill Road, Greenwich, Connecticut

All that certain tract, piece or parcel of land, with the buildings
and improvements thereon, situated in the Town of Greenwich, County
of Fairfield and State of Connecticut, bounded and described as follows:

Beginning at the point formed by the intersection of the division
line between the premises herein described and land now or formerly
of Patrick A. Valentine with the easterly line of Round Hill Road,
running thence along said land now or formerly of Patrick A. Valentine
north 62° 00' east 247.1 feet and 76.58 feet along the arc of a circle
curving to the right on a radius of 398.0 feet to land now or formerly
of Mildred M. Brown, running thence along said land now or formerly of
Mildred M. Brown south 32° 49' 50" east 272.71 feet to land now or
formerly of W. Spencer Harrison and Margie L. Harrison, running
thence along said land now or formerly of W. Spencer Harrison and
Margie L. Harrison south 56" 16' 20" west 119.48 feet and south 62°
00' 40" west 236.49 feet to the easterly line of Round Hill Road,
running thence along said easterly line of Round Hill Road north 26°
15' west 108.76 feet, north 25° 17' west 90.0 feet and north 27° 00'
west 92.4 feet to the point or place of beginning, and containing
2.245 acres.

The general boundaries of the above described premises are northerly
by land now or formerly of Patrick A. Valentine, easterly by land now
or formerly of Mildred M. Brown, southerly by land now or formerly
of W. Spencer Harrison and Margie L. Harrison and westerly by Round
Hill Road.

Received for Record   JAN 1 8 2007   at   1 23 ○ P   M. and recorded by _____
                                                                    Town Clerk

# Exhibit D

Bank of America
2150 Black Rock Turnpike, Suite 7
Fairfield, CT  06825

Bank of Fairfield
2150 Post Road
P.O. Box 1175
Fairfield, CT  06825

Bank of Greenwich
444 East Putnam Avenue
Cos Cob, CT  06807

Bank of Ireland
CT Branch Office
300 First Stamford Place
Stamford, CT  06902

Bank of New York
292 Pequot Avenue
Southport, CT  06890

Chase Manhattan Bank
1401 Post Road
Fairfield, CT  06824

Citi Bank
1275 Post Road
Fairfield, CT  06824

Commerce Bank
1715 Black Rock Turnpike
Fairfield, CT  06825

Community's Bank
211 State Street
Bridgeport, CT  06604

Connecticut Community Bank
National Association
1495 Post Road East
Westport, CT  06880

Cornerstone Bank
211 W. Putnam Avenue
Greenwich, CT  06830

Fairfield County Bank
1312 Post Road
Fairfield, CT  06824

Fieldpoint Private Bank & Trust
100 Field Point road
Greenwich, CT  06830

First County Bank
160 Atlantic Street
Stamford, CT  06904

First Republic Bank
56 Mason Street
Greenwich, CT  06830

Great Western Bank
2537 Post Road
Fairfield, CT  06824

Greenwich Bank & Trust
273 Glenville Road
Greenwich, CT  06831

Hudson City Savings Bank
837 Post Road
Fairfield, CT  06824

Hudson United Bank
1000 Lafayette Boulevard
Bridgeport, CT  06604

Hudson Valley Bank
National Association
1055 Summer Street
Stamford, CT  06905

JP Morgan Chase Bank NA
292 Pequot Avenue
Southport, CT  06890

Metropolitan National Bank
164 Boston Avenue
Bridgeport, CT  06610

New Alliance Bank
211 N. Putnam Avenue
Greenwich, CT  06830

Patriot National Bank
1125 Post Road
Fairfield, CT  06824

Putnam Trust
292 Pequot Avenue
Southport, CT  06890

RBS National Bank
1000 Lafayette Boulevard
Bridgeport, CT  06604

Stamford Bank & Trust
1495 Post Road E
Westport, CT  06880

Summit Bank
1815 Post Road East
Westport, CT  06880

TD Banknorth
1643 Post Road
Fairfield, CT  06824

Wachovia Bank
1499 Post Road
Fairfield, CT  06824

Webster Bank
1177 Post Road, Fl. 2
Fairfield, CT  06824

Westport National Bank
1100 Kings Highway E
Fairfield, CT  06825